502 F.2d 1011
 In the Matter of SEMINOLE PARK AND FAIRGROUNDS, INC., Bankrupt.
Robert DYER, Trustee, Seminole Park and Fairgrounds, Inc., Appellant,
v.
FIRST NATIONAL BANK AT ORLANDO, Indenture Trustee, Appellee.
 No. 73-1063.
 United States Court of Appeals, Fifth Circuit.
 Oct. 17, 1974.
 
 Robert Dyer, pro se.
 Jack H. Zinkow, Orlando, Fla., for debtor and Lieb Group.
 Frank D. Newman, Deland, Fla., for 1st Nat. Bank & Certificate Holders.
 William A. Jacob, Orlando, Fla., for Walker & Laberge and others.
 Before BROWN, Chief Judge, and DYER and SIMPSON, Circuit Judges.
 JOHN R. BROWN, Chief Judge:
 
 
 1
 As with the companion case,[1] we deal with race track problems of Seminole Downs, this time a controversy spanning two reorganizations and being between the Trustee in the 1971 reorganization proceeding and creditors of the earlier 1964 Chapter X proceeding.
 
 
 2
 The specific question is whether the District Court, reversing the recommended order of the Referee in Bankruptcy sitting as a special master, had appropriate power under Chapter X to effectuate a secured interest in favor of the 1964 Certificate Holders in the Florida racing permit as called for by the 1964 plan of reorganization even though the Bank, as indenture trustee[2] of the sinking fund failed to perfect the lien under the Florida UCC. We hold that power exists and was appropriately exercised and affirm the District Court.
 
 
 3
 The 1964 Plan of Reorganization (confirmed in 1966) provided for issuance of Reorganization Certificates of Indebtedness[3] to unsecured creditors to be administered by the Bank under the sinking fund trust.[4] The plan expressly provided that payment was to be secured by a lien on the Florida state racing permit[5] and other specified property.[6]
 
 
 4
 Unfortunately, in 1972 it was discovered in connection with the Bank's claim for unsecured 1964 creditors in the 1971 proceedings that the financing statement required by 679.401 of the Florida UCC to be filed in the Secretary of State's office failed to list as property covered the Florida state racing permit. The Bankruptcy Trustee contended, and the special master agreed, that the Florida UCC controlled and extinguished the secured interest of the Certificate Holders in the racing permit. The District Court disagreed and held the security valid by virtue of the Court's powers to see that the 1964 plan was in fact complied with.
 
 
 5
 As the parties race to the finish line the controversy centers on 229 of the Bankruptcy Act, 11 U.S.C.A. 629.[7]
 
 
 6
 The Trustee invokes 229 by arguing that there had been literal full compliance with elements (a)(1), (2), and (3)-- indeed the District Court virtually found this to be a fact.[8] The Trustee's argument goes on to urge that, since everything required to be done under the plan had in fact been done, for the Court to take action in 1972 by virtue of the 1964 proceedings would amount to an attempt to belatedly modify the plan which is the very thing 229 was to forbid.
 
 
 7
 The Bank, on the other hand, embracing 229 just as enthusiastically, argues that the entry of the 1972 order under attack does not in any sense amount to an amendment of the plan but is simply one giving full fidelity to the express provisions of the plan through an order effectuating it.
 
 
 8
 Fortunately, in resolving the problem of 229 we are spared the necessity of treating it in detail in view of our extensive discussion in Atlas.[9] As we there pointed out, the section serves several important functions. In many ways it is the key to the whole of Chapter X which, as its name reflects, envisages that out of the proceedings will come a new reorganized company capable of sailing forth in the cold, cruel business world with no longer the protective wraps of the federal Bankruptcy Court. Section 229 furnishes the objective criteria for determining when that stage has arrived. As a corollary of this it means also that the Bankruptcy Court has no day-to-day supervision of the business operation of the new enterprise. And one of the principal reasons for its enactment was to inhibit Bankruptcy Courts, either because of economic changes or other circumstances, from succumbing to the temptation too infrequently resisted to second guess the approved plan of reorganization by establishing what was in fact a new plan in the guise of a simple order or an amendment. The possibility that the Bankruptcy Court would, or could legally, do this would be a depressant to the acceptance of the new entity by new creditors, customers, bankers and others dealing with it.
 
 
 9
 But while maintaining the integrity and finality of the approved plan as consummated and preventing Bankruptcy Courts from making changes after that stage are the important functions of 229, the very nature of a statute which seeks to determine when the plan is consummated is to assure that the plan approved is consummated in fact. Whatever the plan calls for must be done. The Bankruptcy Court has the power to see that that is done, and 229 is no obstacle either to the existence of power or the timeliness of the action.
 
 
 10
 A key part of the 1964 plan was the satisfaction of claims of the unsecured creditors. This was to be effected through Reorganization Certificates. Precise provisions were made as to the source of money (a percentage of the pari-mutuel daily handle) and security for payment in the form of a lien on the Florida racing permit (and some other specified properties), see note 6, supra.
 
 
 11
 So far was the racing permit immobilized for ultimate use of others than the Certificate Holders, the reorganized company was even expressly forbidden to transfer, incumber or otherwise dispose of it until the Certificate Holders were satisfied in full.
 
 
 12
 The plan did not merely provide that a mortgage should be given by the reorganized company. The plan stated positively that the Certificate Holders should be secured by a lien on the racing permit. If through oversight, neglect, inadvertence or the like on the part of the Sinking Fund Trustee there were omissions or errors in the recording or filing of the security instruments which would make the security interest of the Certificate Holders something less than that prescribed in the plan, the Bankruptcy Court by appropriate order had the power to accord that status.
 
 
 13
 Far from being a belated effort to alter or amend the plan, what the Court did was to make the plan effective. In short, it was to order the plan to be consummated. This was in full keeping with the express holding and action in Atlas,[10] supra, 384 F.2d at page 89.
 
 Affirmed.[11]
 
 
 [1]
 In re Seminole Park and Fairgrounds, Inc., 5 Cir., 1974, 502 F.2d 1015 (Oct. 17 1974.), No. 73-1065). This case involved the 1971 Chapter X reorganization
 
 
 [2]
 Since we make frequent reference to the 5 Cir., 1974, 502 F.2d 1015 (Oct. 17, 1974.), fund indenture trustee as the Bank and to the creditors as Certificate Holders
 
 
 [3]
 Face value of each non-interest bearing certificate was 75% Of that creditor's outstanding balance due. 25% Of the 'handle' was sacrificed to keep the business going
 
 
 [4]
 The Certificate Holders were to be paid off by 1979 from a sinking fund. The fund was to arise from daily payments equal to 0.5% Of each day's total pari-mutuel handle
 
 
 [5]
 Valued below at $200,000.00
 
 
 [6]
 The plan of reorganization provided:
 ARTICLE III PROVISIONS ALTERING OR MODIFYING THE RIGHTS OF CREDITORS
 The claims of unsecured creditors (Class 5) shall be modified and altered as follows:
 Within 120 days after confirmation of the plan, unsecured creditors shall receive pro rata by check drawn by the trustee the sum of $263,000.
 In addition, within 120 days after confirmation of the plan, the reorganized company shall issue to the unsecured creditors non-interest bearing Reorganization Certificates in the principal amount totaling such sum as will equal 75% Of the total unsecured claims as allowed by this Court, less $263,000. Said Reorganization Certificates shall be issued on a pro-rata basis to unsecured creditors in complete settlement of their claims.
 The Reorganization Certificates may be prepaid on a pro rata basis at any time by the reorganized company, or fully redeemed upon payment to the creditors of the full amount then owing of Reorganization Certificates held by them. The Reorganization Certificates shall be payable in annual installments from a sinking fund accumulated from daily payments made to a Sinking Fund Trustee by the reorganized company of 1/2 of 1% Of its daily pari-mutuel handle of each racing season, but in no event shall the annual payment to the Sinking Fund Trustee be less than $20,000.
 The Reorganization Certificates shall be paid in full on or before December 31, 1979, and shall be secured by a lien on the Florida State Racing Permit owned by the reorganized company, a lien on the alcoholic beverage licenses held in its name, and a first mortgage on the leasehold interest of the reorganized company and all tangible personal property of the reorganized company as of the date of issuance of the Reorganization Certificates other than maintenance and office equipment. In addition, the said mortgage shall contain a clause to encumber all improvements made pursuant to the provisions of this plan.
 The reorganized company shall not transfer, assign, encumber or otherwise dispose of its racing permit until such time as the Reorganization Certificates have been satisfied in full; nor shall it relocate the track site of the permit unless the holders of the Reorganization Certificates are provided with a first mortgage on assets of equal or better value than the security they then hold as certified by two M.A.I. appraisers, one of whom shall be chosen by the Sinking Fund Trustee and the other by the reorganized company. The costs of said appraisal shall be paid entirely by the reorganized company. The provisions of this paragraph and other financial restrictions as set forth in Article X hereof shall be set forth in the Sinking Fund Trust Agreement.
 
 
 [7]
 629. Acts deemed consummating plan; order declaring consummation; substantial alteration or modification
 (a) A plan shall be deemed to have been substantially consummated if, insofar as applicable, each of the following events has occurred:
 (1) transfer, sale or other disposition of all or substantially all of the property dealt with by the plan pursuant to the provisions of the plan;
 (2) assumption of operation of the business and management of all or substantially all of the property dealt with by the plan by the debtor or by the corporation used for the purpose of carrying out the plan; and
 (3) commencement of the distribution to creditors and stockholders, affected by the plan, of the cash and securities specified in the plan as provided for in section 624 of this title.
 (b) Upon notice to the trustee, the debtor, the Securities and Exchange Commission and such other persons as the judge may designate, the trustee, the debtor in possession, the corporation to which the assets of the debtor are to be transferred under the plan, or any other party in interest may apply to the judge for an order declaring the plan to have been substantially consummated under the provisions of subdivision (a) of this section.
 (c) When a plan has been substantially consummated as defined in subdivision (a) of this section, or an order has been entered under subdivision (b) of this section, the plan may not thereafter be altered or modified if the proposed alteration or modification materially and adversely affects the participation provided for any class of creditors or stockholders by the plan. July 1, 1898, c. 541, 229, as added July 7, 1952, c. 579, 26, 66 Stat. 431.
 No subdivision (b) order was ever entered in the 1964 plan proceedings.
 
 
 [8]
 The Court does not agree with the conclusion of the Special Master. The Court does agree, however, that the record in the prior proceedings shows (1) that the cash distribution contemplated by the plan had been made, (2) that the securities (i.e., Certificates of Reorganization) had been distributed, and (3) that the debtor's property had been turned over to the reorganized corporation and that the corporation had commenced business operations under full control of its management. This normally would support a 229 determination that the plan had been substantially consummated
 Order on Classification of Certificate Holders' Claim, Appendix at 127, 129-30.
 
 
 [9]
 In re Atlas Sewing Centers, Inc., 5 Cir., 1967, 384 F.2d 66, Part V (pp. 86-90)
 
 
 [10]
 There we said:
 This is in no sense an amendment of the Plan. The Court has been called upon to act because the Plan, confirmed and approved and adopted by all, has simply not been satisfied * * * at the present * * *. Nor it is an effort by the District Court to insert itself into the day-to-day managerial decisions of a going business. The Court is not attempting to exercise jurisdiction for the purpose of passing upon normal business activities of a rehabilitated corporation or upon other matters not related to the Plan of Reorganization. It would be shocking if merely because of the entry of an order which by name and content was an order of substantial consummation, the Court would find itself powerless to take protective action in the face of admitted substantial non-fulfillment * * *.
 384 F.2d 66 at 89.
 
 
 [11]
 On oral argument the Bankruptcy Trustee urged the Court to disallow a $1,447.00 interest in equipment granted the Bank below because a F.S.A. 679.403(2) continuation statement was required. We think the Trustee's argument comes too late because he expressly conceded that amount in his appellate brief