**In re GENE DUNAVANT AND SON DAIRY, Debtor.**

**FEDERAL LAND BANK OF LOUISVILLE,**

v.

**GENE DUNAVANT AND SON DAIRY and Simmental Breeding Corporation.**

No. 1–86–0056.
Bankruptcy No. 182–03781.

United States District Court,
M.D. Tennessee,
Columbia Division.

April 7, 1987.

E. Franklin Childress, Asst. U.S. Atty., Edwin M. Walker, Nashville, Tenn., for appellant.

Stephen Miller, G. Rhea Bucy, Nashville, Tenn., for appellee.

### MEMORANDUM

MORTON, Senior District Judge.

This matter is before this Court on appeal of an order entered May 16, 1986, by the Honorable George C. Paine, II, United States Bankruptcy Judge, in a case commenced under Chapter 11 of Title 11, United States Code, by Gene Dunavant and Son Dairy, a partnership (sometimes referred to as the "debtor"). The order appealed from confirmed the debtor's Chapter 11 plan, as modified by a post-confirmation modification filed pursuant to 11 U.S.C. § 1127(b). The Federal Land Bank of Louisville ("Land Bank"), a secured creditor of the debtor, filed a notice of appeal with respect

to the order. For reasons more particularly set forth below, the order of the Bankruptcy Judge will be affirmed and Land Bank's appeal dismissed.

The standard of review on this appeal is governed by Rule 8013, Rules of Bankruptcy Procedure, which provides in part as follows: "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of witnesses."

### FACTUAL BACKGROUND

On November 17, 1982 (the "Petition Date"), Gene Dunavant and Son Dairy, a general partnership composed of Gardner Eugene Dunavant and his son, Dennis Dunavant, filed a voluntary petition for relief under Chapter 11 of Title 11, United States Code, with the United States Bankruptcy Court for the Middle District of Tennessee. On the Petition Date the partnership operated a dairy farm in Giles County, Tennessee. Thereafter, the debtor was automatically continued in possession of its properties and continued the operation of its business during Chapter 11 as debtor-in-possession. See, 11 U.S.C. §§ 1107, 1108.

At the Petition Date the debtor's principal assets consisted of approximately 676 acres of improved real property situated in Giles County, dairy cattle, machinery and equipment, and crops and feed. The debtor's principal creditors included Land Bank, which was owed approximately $550,-000.00, secured by deeds of trust on the real property junior only to a deed of trust securing a purchase-money note with a balance of approximately $72,500.00, in favor of Fain Ingram. Farmers Home Administration ("FmHA") was owed approximately $650,000.00, evidenced by four different notes secured variously by junior liens on the real property and first-lien security interests in the cattle, certain machinery and equipment and crops and feed. The debtor owed approximately $150,000.00, to four other entities whose claims were secured by machinery and equipment. Unsecured trade debt totalled approximately $200,-000.00. See, generally, Record, Item 4.

By agreed order entered November 14, 1983, upon the consent of the debtor, Land Bank and FmHA, the debtor was authorized and directed to make monthly payments of $6000 to Land Bank as adequate protection of its liens on land. Record, Item 1. This order, among other things, acknowledged that the Land Bank loan bore interest at a variable rate, but recited that the monthly payments of $6000 had been computed using a rate of twelve per cent (12%) per annum, simple interest. That order also provided in part as follows:

> 6. This order is intended to be an interim order governing certain aspects of this proceeding and accordingly does not estop any party hereto with respect to the question of treatment of a particular claim under a plan of reorganization. * * *

Record, Item 1. Later an agreed order was entered (October 23, 1984), relative to curing defaults in the debtor's performance under the order of November 14, 1983. Record, Item 2.

On October 25, 1984, the debtor filed a proposed Chapter 11 plan and a disclosure statement to accompany same. The plan and disclosure statement were amended under date of November 21, 1984. Record, Items 3, 4. By order entered December 5, 1984, the disclosure statement as amended was approved and a confirmation hearing was set for December 18, 1984. Record, Item 6.

In summary the plan, as amended, provided for a sale and transfer of substantially all the debtor's property—improved real property, cattle, crops and feed, and machinery and equipment—to Simmental Breeding Corporation ("SBC"), a corporation headquartered in Memphis, Tennessee, under the following terms and conditions:

(1) SBC would pay in cash $150,000.00 ($60,000.00 at closing, the balance in four equal quarterly installments due over the year following closing), which sum would be used to pay the administration expenses of the Chapter 11 case which were estimated to total approximately $150,000.00;

(2) SBC would assume and agree to pay certain debts secured by machinery and equipment;

(3) SBC would take the real property subject to the liens of Ingram, Land Bank and FmHA, and subject to repayment terms specified in the plan;

(4) From the earnings of the dairy or otherwise, SBC would make the payments provided in the plan for general, unsecured creditors; and

(5) SBC would employ Eugene and Dennis Dunavant in the continued operation of the dairy for a term of years and at a guaranteed minimum compensation.

See, generally, Record, Items, 3, 4. The plan provided that it would become effective, "... the thirtieth (30th) day following the entry of the order confirming the Plan, provided that no appeal is pending...." Record, Item 3, p. 2.

An important factor in the hoped-for success of the plan was SBC's ability to add milking cows to the debtor's herd thereby increasing revenues at marginal additional cost. Record, Item 4, p. 12.

On December 26, 1984, the Bankruptcy Judge entered an order confirming the debtor's plan. Record, Item 8.

On December 31, 1984, certain steps were taken towards consummation of the plan. In particular, deeds to the real property and bills of sale as to certain personal property were executed by the debtor in favor of SBC and delivered to Stephen M. Miller, Esq., counsel for the debtor-in-possession, as escrow agent. Transcript, pp. 40–42. SBC also delivered to Mr. Miller as escrow agent the sum of $60,000.00, being the cash payment due at closing from SBC. *Ibid.* Also, on December 31, 1984, FmHA filed a notice of appeal of the order of confirmation. Record, Item 9.

The FmHA appeal was dismissed by the District Court on March 28, 1985. Record, Item 10. But FmHA timely appealed the District Court's order to the Court of Appeals. This appeal was pending until July 3, 1985, at which time FmHA voluntarily dismissed its appeal. Transcript, p. 36.

Taking the position that the pendency of the FmHA appeal tolled the effective date of the plan, the parties did little towards consummation of the plan after December 31, 1984. The deeds and other instruments of transfer were never delivered out of escrow, and except for certain small payments to a few administration creditors, the $60,000.00 fund was not disbursed by the escrow agent. Transcript, pp. 40–42. SBC paid none of the balance of the $150,-000.00 required under the plan, and did not place the additional milking cows into the herd as contemplated by the plan. *Ibid.*

For several months following dismissal of FmHA's appeal, the debtor and SBC took no steps to complete the closing of the sale of properties provided for in the plan or otherwise perform the plan. This apparently prompted FmHA to file a motion to dismiss the case. Record, Item 12. Thereafter, on February 19, 1986, SBC filed a motion seeking a determination of the allowed amount of FmHA's secured claim. Record, Item 18. On February 20, 1986, the debtor filed a post-confirmation modification of the plan pursuant to 11 U.S.C. § 1127(b). Record, Item 20a. On February 20, 1986, the debtor also filed a supplement to the previously-approved disclosure statement. Record, Item 20b.

After a hearing conducted March 4, 1986, upon notice to creditors and other parties in interest, by order entered March 21, 1986, the disclosure statement, as supplemented, and as amended and supplemented in open court at the hearing (hereinafter, the "Disclosure Statement"), was approved.[1] Record, Item 23.

In accordance with the order of March 21, 1986, the debtor transmitted to creditors and other parties in interest copies of the Chapter 11 plan, as originally confirmed and as modified, the Disclosure Statement, a ballot conforming to Official

---

1. The Disclosure Statement, as approved on March 21, 1986, is embodied in one document styled, "FIRST AMENDED DISCLOSURE STATEMENT TO ACCOMPANY DEBTOR'S PLAN OF REORGANIZATION DATED OCTOBER 25, 1984, AS AMENDED, AND AS MODIFIED," filed on or about March 24, 1986. Record, Item 24.

Form No. 29, and a copy of said order. Within the time fixed by the order of March 21, 1986, Land Bank and FmHA, filed objections to confirmation of the plan as modified, and cast ballots against the plan. Record, Items 25, 26. All other classes of creditors accepted the plan by the requisite majorities. Transcript, pp. 7–9.

On April 25, 1986, the Bankruptcy Judge conducted a hearing on the debtor's request for confirmation of its Chapter 11 plan, as modified by the post-confirmation modification thereof filed February 20, 1986, and upon the objections of Land Bank and FmHA thereto. In open court at the hearing the debtor sought and obtained leave of court to amend the plan, as modified, as respects the treatment of the secured claims held by FmHA and the Land Bank. Transcript, pp. 4–6. (These amendments are embodied in the AMENDMENTS TO MODIFIED PLAN OF REORGANIZATION filed May 6, 1986. Record, Item 30. Hereinafter, the Chapter 11 plan as confirmed by order entered December 26, 1984, as modified February 20, 1986, and as amended in open court on April 25, 1986, is referred to as the "Plan".) Thereafter, the United States of America for FmHA moved in open court at the hearing for leave to withdraw its objection to confirmation of the Plan and to change its vote previously cast against the Plan to an acceptance of the Plan, and said leave was granted. Transcript, pp. 6–7.

At the hearing the Bankruptcy Judge received oral testimony from Mr. Chris Westbrook, acting county supervisor for Giles County, Tennessee, for FmHA; Mr. Michael Alperin, president of SBC; Mr. Stephen M. Miller, attorney for the debtor-in-possession; Mr. Eugene Dunavant, a general partner in the debtor; Mr. Richard Groce, Vice-President (Land Bank); and Mr. Mark McCance, Director of Financial Planning and Analysis, Land Bank. The Court also received certain documentary evidence and stipulations of the parties.

On May 16, 1986, the Bankruptcy Judge caused to be entered FINDINGS OF FACT AND CONCLUSIONS OF LAW RELA- TIVE TO CONFIRMATION OF DEBTOR'S CHAPTER 11 PLAN, AS MODIFIED, AND THE OBJECTION THERETO and an order confirming the Plan. Record, Items 31, 32. On May 27, 1986, Land Bank filed a notice of appeal of the confirmation order of May 16, 1986. Record, Item 35.

I.

As respects the modification of a confirmed Chapter 11 plan, the Bankruptcy Code provides as follows:

(b) The proponent of a plan or the reorganized debtor may modify such plan at any time after confirmation of such plan and before substantial consummation of such plan, but may not modify such plan so that such plan as modified fails to meet the requirements of sections 1122 and 1123 of this title. Such plan as modified under this subsection becomes the plan only if circumstances warrant such modification and the court, after notice and a hearing, confirms such plan as modified, under section 1129 of this title.

11 U.S.C. § 1127(b). On this appeal Land Bank contends that the order confirming the debtor's plan as modified violates § 1127(b) in three respects:

(a) the confirmed plan could not be modified because it had already been "substantially consummated";

(b) the circumstances do not warrant such modification; and

(c) the modification was not made by the proponent of the plan or the reorganized debtor.

A. Substantial Consummation.

"Substantial consummation" is specially defined in Chapter 11 as follows:

(2) "substantial consummation" means—

(A) transfer of all or substantially all of the property proposed by the plan to be transferred;

(B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all

or substantially all of the property dealt with by the plan; and

(C) commencement of distribution under the plan.

11 U.S.C. § 1101(2). The use of the conjunctive in this definition makes it plain that all three elements must be present to warrant a finding of substantial consummation.

In its findings and conclusions the Bankruptcy Court held, "Because there has not been a transfer of all or substantially all of the property to SBC as provided by the plan, there has been no substantial consummation thereof within the meaning of sections 1101(2) and 1127(b)." Record, Item 32, p. 12.

The uncontradicted evidence on this point is that on December 31, 1984, there was a closing in escrow of the sale of assets to SBC as contemplated by the plan. Transcript, p. 40. Deeds as to the realty and bills of sale and assignments as to the personalty were executed by the debtor and delivered in escrow to Stephen M. Miller, Esq., the debtor's attorney, as escrow agent. *Ibid.* At this time SBC delivered to Mr. Miller as escrow agent the sum of $60,000.00, the cash required from SBC at closing. *Ibid.*, at 42. It was contemplated that the escrow would be closed when the appeal period applicable to the Bankruptcy Court's confirmation order of December 26, 1984, had expired. *Ibid.*, at 40–41.

On the same day as the closing in escrow, December 31, 1984, FmHA filed a notice of appeal of the confirmation order. Record, Item 9. This appeal was pending in one form or another until July, 1985. Transcript, p. 36. As a result of the pendency of that appeal the escrow was never closed. Transcript, pp. 40–42. Even after FmHA voluntarily dismissed its appeal in July 1985, the escrow was not closed, because by then SBC was refusing to pay the additional cash required by the contract; it was then evident to Miller that the plan would have to be modified. *Ibid.*, at 41. As of April 25, 1986, the date of the confirmation hearing on the modification, the escrow still had not been closed: the deeds

and bills of sale had not been delivered to SBC or recorded. *Ibid.*, at 40.

As it did before the Bankruptcy Judge, Land Bank urges this Court to disregard the legal consequences of the escrow arrangement and of its failure to close, and to focus instead on the manner in which the farm was being operated during the pendency of the FmHA appeal. During this period, according to Land Bank, SBC had "taken over complete control of dairy operations, and employed Debtors [sic] as its on-site hands."

The facts concerning management control of the dairy after the closing in escrow are relevant to the question of whether SBC had assumed management of the property (factor (B) in the statutory definition of "substantial consummation"). However, the evidence will not support Land Bank's assertion that SBC was in control. What the record shows is that during the limbo created by FmHA's appeal the farm was run on a day-to-day basis by the Dunavants. Transcript, p. 22. Major decisions were made after consultation among the interested parties. For example, officials of SBC and the Dunavants jointly made decisions concerning the making of certain capital improvements to the dairy during this period. *Ibid.* Mr. Dunavant testified he would not have invested in new equipment during this period without conferring with his attorney and Mr. Alperin, president of SBC. *Ibid.*, at 69–70. SBC was given the right to cull cattle in consultation with the debtor. *Ibid.*, at 47. When Dennis Dunavant had the idea of submitting a bid on behalf of the dairy pursuant to the government's dairy termination program, officials of SBC, as well as the attorneys for both parties, were consulted and approved the bid. *Ibid.*, at 35.

On this record the Bankruptcy Judge concluded as follows:

It is evident that the plan confirmed herein on December 26, 1984, has not been substantially consummated within the meaning of § 1101(2). The executed deeds and other instruments of conveyance remain in escrow and have never been delivered to SBC. SBC has not

tendered the balance of the case due after the closing. The debtor remains in possession of the real and personal property which is to be transferred to SBC under the plan. True, by consent of the Dunavants, SBC has been granted a voice in the management of the dairy since December 31, 1984, but this has not been the exclusive and plenary role contemplated by the plan. Because there has not been a transfer of all or substantially all of the property to SBC as provided by the plan, there has been no substantial consummation thereof within the meaning of sections 1101(2) and 1127(b).

Record, Item 32, pp. 11–12.

■ Although it is a close question, the findings of the Bankruptcy Judge in this respect are not clearly erroneous. Moreover, even if SBC was "managing" the property, a "transfer" of the property (factor A in the statutory definition of "substantial consummation") had *not* taken place. The escrow arrangement is not simply a legal fiction. It was intentionally employed by the parties so they could accomplish most of the mechanics of the closing without having a closing legally take place until the order of confirmation was final, debtor's counsel had concluded the required title work, and the like. In other words, the escrow was used precisely to prevent a transfer of the properties from happening.

The funds and documents were placed in escrow with the intent that they remain there until the expiration of any appeal period or the termination of any appeal taken—at which time the plan would become effective. Although arguably the plan became effective in August 1985, neither the funds nor the documents were distributed. To identify a deposit in escrow as a "transfer of property" under the plan ignores the practical purposes of an escrow arrangement and this court, as did the Bankruptcy Court, declines to do so.

In sum, this court can find no adequate basis for disturbing the conclusion of the Bankruptcy Court that the debtor's plan had not been substantially consummated,

hence, the plan was subject to being modified pursuant to 11 U.S.C. § 1127(b).

**B. Circumstances Warranting Modification.**

As respects the circumstances warranting the proposed modification, the Bankruptcy Judge found as follows:

The Court also finds in this regard that circumstances warrant the modification as proposed by the debtor. These circumstances include,

(1) the financial effect of the failure of SBC to place additional milking cows into the herd which, in turn, resulted from the pendency of the FmHA appeal and the failure of the plan to become effective until August, 1985;

(2) the need for an allocation of the total allowed secured claim of FmHA among its various notes with their varying rates of interest and amortization periods, or some other clarification of this; this results from the failure of the plan, as originally confirmed, to address the possibility (and, now, the reality) that FmHA's secured claim would be allowed in an amount less than the total claim of FmHA; and

(3) the need for the rate of interest on the FLB claim after confirmation to be specified; this results from the plan's attempt to specify treatment of FLB's claim by incorporation of prior orders relating to adequate protection of the claim pending confirmation.

Record, Item No. 32, pp. 12–13.

As respects the first finding—that the loss of revenues caused by SBC's failure to place additional milking cows into the herd during the pendency of the FmHA appeal had rendered the plan unworkable—Land Bank argues that this was not its fault; that it was SBC's decision not to place additional cows into the herd, hence, SBC should be held responsible for this loss of revenues. Land Bank, however, fails to show that under the circumstances SBC's decision was unreasonable, in bad faith, or in violation of SBC's contract with the debtor. We note that although failure to place

additional cows in the herd was a poor business decision, SBC was probably justified in not doing so during the pendency of FmHA's appeal. This finding is not clearly erroneous.

■ The Bankruptcy Judge found that during the pendency of the FmHA appeal the debtor suffered a loss of revenues so serious as to render the original plan unworkable; he did not find that this was the result of any culpable act or omission on the part of SBC, the debtor or any other party. This finding, standing alone, would seem to justify a reworking of the plan subject, of course, to the general provisions governing plans (see, 11 U.S.C. §§ 1122, 1123), and to the general confirmation requirements contained in 11 U.S.C. § 1129. Land Bank has cited no authority contrary to this proposition. Given this, and given the fact that Land Bank alone held approximately one-third of the debtor's outstanding debt, it is only reasonable to expect that Land Bank would somehow be affected by the modification.

In fact, the modified plan was premised on significantly lower payments to creditors than the plan confirmed in December 1984. Under the modification, the payout to all general, unsecured creditors was cut in half. A significant portion of the claim of FmHA was recognized to be unsecured, to be discharged upon payment of ten cents on the dollar over a period of years without interest; the remainder, while treated as secured, would bear interest at rates significantly below the average contract rates of interest on the outstanding notes to FmHA. The interest rate on the Land Bank note was fixed for five years at 10¼ percent. Certain holders of administrative expense claims, who are entitled to payment in full on the effective date of the plan, were asked to and did accept an extended payout on their claims.

The Bankruptcy Judge heard testimony that after taking into account all these reductions in the required payments to creditors under the plan, in the first year after confirmation, the farm would still have a deficit cash flow to the extent of $30,000. After that first year the farm is expected to generate enough cash to meet ongoing expenses and payments under the plan. Under the modification SBC agrees to fund the anticipated cash shortfall of $30,000, in the first year after confirmation. In other words, to make the plan financially workable, not only would the payments to most creditors have to be significantly reduced as provided in the modification, but the buyer, SBC, would have to invest significantly more cash in the farm.

On this record this court can find no basis to disturb the conclusion of the Bankruptcy Judge that circumstances warranted modification of the plan.

C. Identity of the Proponent of the Modification

Land Bank argues that the modification was not made by the proponent of the plan or the reorganized debtor, hence, § 1127(b) was violated.

It is undisputed that the debtor was the proponent of the plan which was confirmed by the order of December 26, 1984, and which is the subject of the disputed modification. The modification of that plan which was filed February 20, 1986, recites as follows:

Gene Dunavant and Son Dairy, debtor in the captioned case and proponent of the Plan of Reorganization dated October 25, 1984, which, as amended, was confirmed by order entered herein December 26, 1984 (said Plan of Reorganization, as amended, being hereinafter referred to as the "Plan"), modifies the Plan pursuant to 11 U.S.C. § 1127(b), as follows: ....

Record, Item 20. This document was executed by the debtor and by the debtor's counsel of record. The further modification made in open court on April 25, 1986, and filed May 6, 1986, contains a similar recitation and is executed by the debtor's counsel of record. Record, Item 30.

In his findings of fact and conclusions of law the Bankruptcy Court states simply (p. 9), "On February 20, 1986, the debtor filed a modification of the plan pursuant to 11 U.S.C. § 1127(b)." The court also notes that the debtor sought and obtained leave

in open court to amend the modification. The opinion is devoid of specific findings regarding the proponent of the modification since this issue was not raised below.

In its brief, Land Bank argues that the modification was not in fact proposed by the debtor; that "Mr. Dunavant knew nothing about the state of affairs"; that "the modification was undertaken solely by and for the sole benefit of SBC...." Thus, it is argued, § 1127(b) has been violated.

Unquestionably, SBC had a major role in the decision to modify the plan and in the formulation of the modification. The plan as originally confirmed provided for a sale of substantially all the debtor's assets to SBC, which would continue to use them in the operation of a dairy. SBC would employ the Dunavants in this enterprise. SBC agreed to assume certain of the debtor's debts. SBC did not assume the debts secured by real property such as those of Land Bank and FmHA, but expressly was to take title to the land subject to the liens securing those claims. Naturally, the plan's terms respecting the restructure of these debts was important to SBC.

As a result of the appeal of the first order of confirmation, SBC was unwilling to close the sale and proceed with the substantial investment in the dairy contemplated by the plan. Some eight months later after the appeal was dismissed and the plan arguably became effective, SBC took the position that the plan was no longer workable and could not be performed. At this point SBC and the debtor became adversarial. At the suggestion of the debtor's attorney SBC employed counsel. Negotiations between SBC, the debtor and various creditors followed. The result of these negotiations was an amendment of the agreement between the debtor and SBC and the filing by the debtor of a modification of the plan to conform to and implement this amendment.

 Indeed, SBC had a major stake and role in the modification of the plan and in the confirmation process which followed. But the fact that the debtor negotiated over, or even accepted major input regarding the modification, does not automatically preclude his status as "proponent." In sum, this court can find no sufficient basis for holding that the operative documents on file in this case are other than what they appear to be. The finding of the Bankruptcy Judge that the debtor is the proponent of the modification is not clearly erroneous.

## II.

As respects the secured claim of Land Bank, the Plan provides that the principal balance plus all interest accrued to the effective date of the Plan at the contract rate shall be amortized in monthly payments of principal and interest over 30 years. During the first five (5) years after the effective date of the Plan, the debt bears interest at 10¼% per annum; thereafter, the interest rate is the rate specified in the contract. At the time of the hearing Land Bank's contract rate was 12¾% per annum. Transcript, pp. 84–85.

Land Bank contends that it should be allowed its contract rate of interest after the effective date of the Plan, and the failure of the Plan to do so violates sections 1129(a)(7)(A)(ii) and 1129(b)(2)(A)(i). In rejecting Land Bank's contention, the Bankruptcy Judge held that the cited code sections require only that Land Bank receive a current market rate of interest on its claims, and that 10¼% per annum is a current market rate of interest for comparable loans.

Sections 1129(a)(7)(A)(ii) and 1129(b)(2)(A)(i) require the Bankruptcy Court to analyze the present value of the stream of payments or other consideration provided by a plan. This concept of present value assumes the use of *market* rates of interest (as distinguished from the rate specified in the contract) for loans of similar duration, with similar security, and with similar risks. 5 *Collier on Bankruptcy* (15th ed. 1985) ¶ 1129.03[i]; *see, Memphis Bank & Trust Co. v. Whitman.*, 692 F.2d 427 (6th Cir.1982) (construing 11 U.S.C. § 1325(a)(5)(B), the language of which is virtually identical to that contained in § 1129).

In determining the allowed amount of the claim of a fully-secured creditor, the creditor is entitled to his contract rate of interest up to the effective date of the plan by virtue of 11 U.S.C. § 506(b), and the Dunavant plan as modified so provides. But this rule has no application to the present value analysis required by § 1129, or to the interest payable on claims after the effective date of a plan. 3 *Collier on Bankruptcy* (15th ed. 1985) ¶ 506.05 at 506–43.

At the hearing the debtor presented evidence that FmHA was then making 20–year, fixed-rate loans secured by farm real property at 10¼% per annum. Transcript, p. 10. The debtor offered evidence concerning the current level of interest rates generally. Transcript, pp. 11–12.

By contrast, Land Bank offered no evidence tending to show that the current market rate of interest for a comparable loan is other than 10¼% per annum. Instead, Land Bank maintained that it was entitled to its contract rate of interest, regardless of current market conditions.

Mark McCance, Land Bank's Director of Financial Planning and Analysis, admitted on cross-examination that Land Bank's variable contract rate bears little or no relation to current market rates of interest. Transcript, pp. 80, 82. Instead, Land Bank's contract rate is determined by taking a weighted average of all its outstanding interest-bearing liabilities and adding thereto its "spread," typically one-quarter to three-quarters of a percentage point. *Ibid.*, at 79–80. This rate, thus, reflects the historical cost of funds rather than the current cost of funds. Indeed, Land Bank's sister institutions were currently (April, 1986) selling five-year bonds with a coupon of approximately 8%. *Ibid.*, at 81. But the Federal Land Bank of Louisville was not then selling new bonds in the current market, and this creates a situation where its formula for variable-rate loans creates an artificially high contract rate. *Ibid.*, at 90.

Land Bank does not contend that there are special risks incident to this loan which justify an interest-rate premium. On the contrary, Land Bank is willing to lend to this debtor at its regular variable contract rate, the same rate it makes available on other loans of comparable duration and similarly secured.

Land Bank relies heavily on the decision in *In re Monnier Brothers*, 755 F.2d 1336 (8th Cir.1985), for the proposition that Land Bank should receive its contract rate of interest on its secured claim after confirmation. In *Monnier* both the debtor and the secured creditor failed to introduce any relevant evidence as to the current market rate of interest for a comparable loan. The District Court noted that because the loan in question was closed only twenty months prior to the confirmation hearing, the contract rate was some evidence of the current market rate of interest for comparable loans. In the absence of any other relevant evidence, the district court found that the contract rate of interest was the current market rate of interest for comparable loans. The Eighth Circuit held that this finding, considering the state of the proof, was not clearly erroneous. In so holding, however, the Eighth Circuit affirmed the proposition that in applying the "present value" test contained in sections 1129(a)(7)(A)(ii) and 1129(b)(2)(A)(i), the Bankruptcy Court is to utilize the current market rate of interest for comparable loans. *In re Monnier, supra*, 755 F.2d at 1339.

■ The proof in this case, as summarized hereinabove, differs from that in the *Monnier* case in two important respects. First, the debtor did offer evidence that the current market rate of interest for a comparable loan, i.e., a long-term, fixed-rate loan secured by farm property, was 10¼ percent. This evidence was uncontradicted and the Bankruptcy Judge accepted it. Second, the debtor adduced testimony tending to show that the Land Bank's contract rate of interest was considerably in excess of the current market rate of interest for comparable loans. In sum, *Monnier* is readily distinguishable from the case at bar and in any event, we decline to adopt the Eighth Circuit's reasoning.

In applying the confirmation standards contained in sections 1129(a)(7)(A)(ii) and

1129(b)(2)(A)(i), the Bankruptcy Judge applied the correct legal standard and his finding that 10¼ percent is a current market rate of interest for comparable loans is supported by the evidence.

An appropriate order affirming the order of the Bankruptcy Judge and dismissing Land Bank's appeal will be entered.

### ORDER

In accordance with the memorandum contemporaneously filed herewith, it is ORDERED that the Order Confirming Plan entered in the captioned bankruptcy case on May 16, 1986, be and is hereby in all respects affirmed, and the appeal filed by the Federal Land Bank of Louisville with respect to said order be, and is hereby dismissed.