**UNITED STATES of America, Farmers Home Administration, Plaintiff/Appellant,**

**v.**

**Leonard James NOVAK and Martha Mae Novak, Defendants/Appellees.**

Civ. No. 88–5010.

United States District Court, D. South Dakota, W.D.

May 20, 1988.

Robert J. Haar, Asst. U.S. Atty., Sioux Falls, S.D., for plaintiff/appellant.

Max A. Gors, Gors, Braun and Zastrow, Pierre, S.D., for defendants/appellees.

## MEMORANDUM OPINION

BATTEY, District Judge.

### PROCEDURAL HISTORY

Pursuant to 28 U.S.C. § 158(a), the Appellant (FmHA) appeals a bankruptcy court order modifying the Appellees' (Novaks) final amended Chapter 11 plan of reorganization. Both parties have submitted their respective arguments and authorities pursuant to Bankruptcy Rule 8009. Oral argument on the issue raised by this appeal was held May 19, 1988, at 1 p.m.

## FACTS

Novaks filed their Chapter 11 petition for reorganization on September 14, 1984. On May 16, 1985, the bankruptcy court, the Honorable Peder K. Ecker presiding, entered an order confirming the Novaks' final amended plan.

The property subject to the terms of the confirmed plan included 800 acres of farmland located in Bennett County, South Dakota. The first mortgage on this land was held by the Federal Land Bank of Omaha in the amount of $97,384.62. A second mortgage was held by FmHA. By stipulation the parties agreed that the value of the 800 acres equaled $180,000, or $225 per acre. This valuation left FmHA with a secured claim of $82,615.38, arrived at by subtracting the $97,384.62 first mortgage of the Federal Land Bank from the $180,-000 land value.

The designated record reflects that the Novaks had three loans with FmHA, with a total principal and interest due of $372,193. Under the provisions of the confirmed plan, FmHA's secured claim of $82,615.38 was to be recouped over the course of thirty-five years at a scheduled amortized annual payment of $5,045.44. The undersecured portion of FmHA's claim equaled $289,577.62 ($372,193.00 minus $82,615.38). Under the plan, this amount was to be paid a dividend of ten percent over ten years with no interest at an annual payment rate of $2,895.77.

Following confirmation of the plan, the Novaks, as disbursing agents, made two payments to FmHA. The first payment of $5,213.15 was made on May 16, 1986; the second payment of $3,000 was made on June 13, 1986. The total of the two payments equaled $8,213.15.

On August 20, 1987, the Novaks moved to modify the confirmed plan only as it related to the secured and undersecured claims of FmHA (denominated in the confirmed plan as "Class 6" claims). The motion to modify was based upon the fact that the land subject to the second mortgage held by FmHA had declined in value. In connection with their motion to modify, Novaks moved the bankruptcy court to determine the value of the property of Novaks' estate and of the FmHA's security in that property.

Hearing on the motion to modify was held on November 24, 1987. The bankruptcy court found that following the confirmation of the Novaks' plan in May of 1985, there had been a downward shift evaluation of the real estate subject to the plan.[1] Relying on a line of cases dealing with a percentage of consummation, the bankruptcy court went on to find that there had not been substantial consummation of the plan pursuant to 11 U.S.C. § 1127. Specifically, as to this question, the bankruptcy court concluded that the amount of payments under the plan (which equaled four percent of the total payments due) was not a majority of consummation, i.e., in excess of fifty percent of the payments contemplated under the plan. Based upon the legal conclusion that the payment of less than a majority of payments under a confirmed plan is less than substantial consummation, the bankruptcy court entered an order on December 10, 1987, modifying the Class 6 portion of the Novaks' Chapter 11 plan.

## ISSUE

The question presented is whether the bankruptcy court erred in finding that as a matter of law, the Novaks' Chapter 11 plan had not been substantially consummated.

## STANDARD OF REVIEW

When the district court reviews a bankruptcy court's final order, it acts as an appellate court. 28 U.S.C. § 158(a); *Wegner v. Grunewaldt*, 821 F.2d 1317, 1320 (8th Cir.1987). The bankruptcy court's findings of fact cannot be set aside unless clearly erroneous, but the district court may review the bankruptcy court's legal conclusions *de novo*. Bankruptcy Rule 8013; *Wegner*, 821 F.2d at 1320; *In re*

---

1. The bankruptcy court's findings of fact note that in addition to a dramatic decrease in the value of farmland in South Dakota, one quarter section of the particular land in question did experience a further downshift due to an increase in the salt content of the soil, requiring that it be returned from irrigated cropland to pastureland.

*Hunter,* 771 F.2d 1126, 1129, n. 3 (8th Cir.1985).

### DISCUSSION

11 U.S.C. § 1127(b) provides that:

The proponent of a plan or the reorganized debtor may modify such plan at any time after confirmation of such plan and before substantial consummation of such plan,....

The term "substantial consummation" is defined at 11 U.S.C. § 1101(2) to mean:

(A) transfer of all or substantially all of the property proposed by the plan to be transferred;

(B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and

(C) commencement of distribution under the plan.

The use of the conjunctive in this definition makes it plain that all three elements must be present to warrant a finding of substantial consummation. *In re Gene Dunavant and Son Dairy,* 75 B.R. 328, 332 (M.D. Tenn.1987). In other words, all three criteria must be satisfied before a plan may be considered substantially consummated. *In re Heatron, Inc.,* 34 B.R. 526 (Bankr.W.D. Mo.1983). In this case, both parties agree that factors (B) and (C) of the statutory definition have been accomplished, thus the only question presented is whether or not there has been a "transfer of all or substantially all of the property proposed by the plan to be transferred." 11 U.S.C. § 1101(2)(A).

The government argues that the doctrine of res judicata should control the outcome

of this appeal in that upon confirmation of a plan, that plan and its provisions are binding upon all parties concerned. 11 U.S.C. § 1141(a).[2] The government cites *Stoll v. Gottlieb,* 305 U.S. 165, 59 S.Ct. 134, 83 L.Ed. 104, *reh'g denied* 305 U.S. 675, 59 S.Ct. 250, 83 L.Ed. 437 (1938) for the proposition that in the absence of proof of fraud in the obtainment of a judgment, res judicata should apply to matters which are covered by a plan of reorganization confirmed by a final order of a bankruptcy court. *See also* 5 Collier on Bankruptcy § 1142(a) (15th ed. 1979).

Novaks assert that the total payments due FmHA under the provisions of the plan equaled $205,548.10.[3] At the time of hearing on the proposed modification, Novaks had paid four percent ($205,548.10 divided by $8,213.15) of the total payments due FmHA under the plan. These payments occurred over the first two years of the plan. Novaks argue that these facts do not support a finding of "substantial consummation" as that term is defined at 11 U.S.C. § 1101(2) and applied at 11 U.S.C. § 1127(b). Accordingly, it is Novaks' position that because there had been no substantial consummation, the bankruptcy court's order of modification was appropriate.

### A. RES JUDICATA

The government's argument of res judicata is misplaced. Res judicata acts as a bar only when a court is asked to take an action which would effectively modify or reverse the judgment of another court in a case the first court is not reviewing on appeal. *In re A.J. Mackay Co.,* 50 B.R.

---

2. 11 U.S.C. § 1141(a) provides, "Except as provided in subsections (d)(2) and (d)(3) of this section, the provisions of a confirmed plan bind the debtor, any entity issuing securities under the plan, any entity acquiring property under the plan, and any creditor, equity security holder, or a general partner in, the debtor, whether or not the claim or interest of such creditor, equity security holder, or general partner is impaired under the plan, and whether or not such creditor, equity security holder, or general partner has accepted the plan."

3. As to FmHA's secured and undersecured claims (Class 6), the secured claims were amortized over thirty-five years with annual payments of $5,045.44. The total secured claim recovery equaled $5,045.44 times 35, which equals $176,590.40. The undersecured claims of FmHA equaled $289,577.62 and were to be paid a ten percent dividend over ten years. Total unsecured claim recovery equaled $2,895.77 times 10, which equals $28,957.70. Total recovery of Class 6 claims over the term of the plan equaled $176,590.40 plus $28,957.70 equaling $205,548.10.

756, 758 (Bankr.D.Utah 1985). That is not the case here. Although it is true that there are limits on a bankruptcy court's power to revoke a plan that it has previously confirmed (*see, e.g.* 11 U.S.C. § 1144—Fraud and the Procurement of Order of Confirmation), the section of the code which is at issue herein specifically authorizes intervention by a court to modify a post-confirmed plan. 11 U.S.C. § 1127(b).

**B. 11 U.S.C. § 1127(b)**

■ The controlling statute in this case is 11 U.S.C. § 1127(b). The predecessor to section 1127 was section 229 of the Bankruptcy Act, 11 U.S.C. § 529 (repealed). Former section 229 was added to the Bankruptcy Act by Congress in 1952 to:

> [C]larify the ... uncertainty as to the point in the reorganization proceeding at which rights vest under the plan sufficiently to make it equitable to cut off further right to amend or modify the plan as to matters materially and adversely affecting the rights of creditors or stockholders.

H.R. Report No. 2320, 82d Congress, 2d Sess. 16 (1952), 1952 U.S. Code Cong. & Admin.News 1960, 1976–77. Congress has long recognized that the process of reorganization is involved and complex and, after confirmation, requires a prolonged period of time for its consummation. *Id.*

> It is generally difficult to determine in a particular case when the transfer of property has occurred to such an extent as to vest rights which may subsequently not be taken away.... [I]f the time of substantial consummation of the plan is held to be determinative, uncertainty now exists as to the exact time when substantial consummation has occurred.... These uncertainties make it difficult to get credit, make contract, and receive such commitments ... as may be necessary to consummate the plan.

*Id.* Given these difficulties, Congress added section 229 which provided for an application to be made to the court or an order declaring the plan substantially consummated. 1952 U.S. Code Cong. & Admin.

News 1978. Thus, a precise date was fixed at which a plan was substantially consummated; thereafter, any alterations or modifications of the plan were prohibited if they materially and adversely affected participation in the plan of any class of creditors or stockholders.

The case law surrounding the interpretation of the term "substantial consummation" as used in section 1127(b) and defined at 1101(2) is limited. Even more limited is the law surrounding the meaning of the terms "all or substantially all" as those words are used in subsection (A) of section 1101(2). In deciding this issue the bankruptcy court in this case relied on what it termed a "majority of consummation of payments percentagewise" as being a valid test for determining whether or not a transfer of all or substantially all of the property had been made and thus the plan substantially consummated. Although the designated record does not reflect the bankruptcy court's authority for its position, at least one court has held that it is proper to look to the percentage of payments made under a confirmed plan as an indication of whether all or substantially all of the property has been transferred. *See, e.g., In re Heatron, Inc.,* 34 B.R. 526 (Bankr.W.D.Mo.1983).

In *Heatron,* fifty-three percent of the total payments due under the debtors' confirmed plan had been transferred to creditors. *Id.* at 527. As in this case, factors (B) and (C) of section 1101(2) had been satisfied. *Id.* Thus, the sole question before the court in *Heatron* was whether "substantially all of the property of the proposed plan" had been transferred. 11 U.S.C. § 1101(2)(A). The court stated, "The word 'substantial' suggests more than halfway, more than a preponderance. When used with the word 'all,' ... there is a suggestion of completeness." *Id.* at 529. Given these definitions, the court in *Heatron* held that the debtors' plan had not been substantially consummated because not all or substantially all of the property which was to be transferred under the plan had been transferred. *Id.* In other words, the court held that a fifty-three percent

transfer of property was not a transfer of substantially all of the property.

A contrary view to that espoused by the *Heatron* court is that found in the case of *In re Hayball Trucking, Inc.,* 67 B.R. 681 (Bankr.E.D.Mich.1986). In *Hayball,* the debtor had moved to modify a confirmed plan and agreed that subsection (B) of section 1101(2) had been satisfied. 67 B.R. at 682. In support of his motion to modify, the debtor submitted by way of affidavit that partial payments had been made under the plan to administrative priority creditors, tax priority creditors, unsecured creditors, and secured creditors. *Id.* In addition, priority fringe benefit creditors had been paid in full. *Id.* Accordingly, the court found that it was "abundantly clear" that the debtor had commenced distribution under the plan, thereby satisfying the requirement of subsection (C) of 11 U.S.C. § 1101(2). *Id.* The only issue remaining for the court was whether there had been a transfer of all or substantially all of the property proposed by the plan to be transferred. *Id.* (Both parties in *Hayball* had stipulated that section 1101(2)(B) had been satisfied.)

In *Hayball,* the debtor argued that significantly less than half of the property had not been transferred to the creditors as per the plan. In support of his position that "substantially all" of the property had not been transferred, the debtor relied on *Heatron* and its rationale. The *Hayball* court rejected the debtor's reliance on *Heatron,* stating:

> The difficulty with the analysis in *Heatron* is that it makes a nullity of subsection (C). If subsection (A), relating to the transfer of all or substantially all of the property proposed by the plan to be transferred, is interpreted to include distributions to creditors proposed by the plan to be made over a period of time, then the requirement of subsection (C) will always be met when the requirements of subsection (A) are met. If that was the intent in setting forth this definition, then there would have been no need to include a separate requirement for "commencement of distribution under the plan." It is a common axiom that a

statute should be construed to give meaning to all of its provisions, if possible. (Citations omitted.)

. . . . .

> Although the statutory definition of "substantial consummation" is not entirely clear, the Court concludes that distribution to creditors over a period of time are not the types of transfers of property proposed by the plan to be transferred contemplated in subsection (A). In order to give effect to the provision requiring only commencement of such distributions, it must be concluded that the property transfers contempleted in subsection (A) include other types of transfers such as are often contemplated on or shortly after the effective date of a confirmed plan....

> Thus, subsections (A) and (C) appear to distinguish between transfers of property to or from the debtor at or near the time the plan is confirmed undertaken to shape the new financial structure of the debtor and distributions of dividends to creditors made over a period of time from operating revenues. "Substantial consummation" requires completion or near completion of the former, but only commencement of the latter.

*Hayball,* 67 B.R. at 684.

The question presented here as it was before the bankruptcy court must be resolved by means of statutory interpretation. The meaning of "all or substantially all" as set forth at 11 U.S.C. § 1101(2)(A) is a question of law. As noted at the outset, this Court's standard of review is *de novo. See Wegner v. Grunewaldt.*

In construing legislation, the primary function of the courts is to effectuate legislative intent. *Philbrook v. Glodgett,* 421 U.S. 707, 713, 95 S.Ct. 1893, 1898, 44 L.Ed.2d 525 (1975). Where the literal language of the statute does not conclusively reveal legislative intent, the courts must look beyond literal meaning, analyzing the provisions in context with the whole. *Kokoszka v. Belford,* 417 U.S. 642, 650, 94 S.Ct. 2431, 2436, 41 L.Ed.2d 374 (1974). Finally, a construction of one part or provision of a

statute which renders another part redundant or superfluous should be rejected. All parts of a statute should be given effect. *Jarecki v. Searle & Co.,* 367 U.S. 303, 307–08, 81 S.Ct. 1579, 1582–83, 6 L.Ed. 2d 859 (1961); *see also In re Arnett,* 731 F.2d 358, 361 (6th Cir.1984) *cited with approval in Hayball,* 67 B.R. at 684.

Applying these above guidelines, this Court concludes that the *Hayball* rationale is more convincing. To apply a majority of payments rule as the bankruptcy court did or an even more substantial requirement as per *Heatron,* would not effectuate what this Court believes to be the legislative intent of sections 1102(2) and 1127(b). In fact, such a construction would contravene the basic purpose of a bankruptcy reorganization—that is, to provide for "a new reorganized company capable of sailing forth in the cold cruel business world with no longer the protective wraps of the federal bankruptcy courts." *In re Seminole Park and Fairgrounds, Inc.,* 502 F.2d 1011, 1014 (5th Cir.1974) *cited with approval in Hayball,* 67 B.R. at 684.

The facts of this case illustrate why a majority of payments rule is unworkable. With respect to FmHA's undersecured claim, a majority of payments rule would allow a confirmed plan to be subject to modification as late as 1991.[4] With respect to FmHA's secured claim, the majority of payments rule of construction would mean that a fifty percent recovery would not be made until after November 16, 2003.[5]

Under the rationale of *Heatron,* even a payment schedule effectuating a fifty percent completion would satisfy the requirements of 11 U.S.C. § 1101(2)(A). Like the court in *Hayball,* this Court finds that subsections (A) and (C) of 11 U.S.C. § 1101(2) distinguish between transfers of property to or from the debtor at or near the time the plan is confirmed and distributions of dividends to creditors made over a period of time from operating revenues. "Substantial consummation" requires comple-

tion or near completion of the former, but only commencement of the latter. *See Hayball, supra.*

■ In addition, this Court points out that the debtors were appointed by Article III of the final amended plan as "disbursing agents." This provision confirms the fact that as "disbursing agents," the debtors were to make all of the cash payments under the plan. In other words, the debtors wore two hats—the first as debtors in possession of the property which had been transferred to them under the terms of the plan, and the second as disbursing agents of the cash payments to be made. The former status effectuating a "transfer of all or substantially all of the property proposed by the plan to be transferred" (section 1101(2)(A)) and the latter effectuating the "commencement of distribution under the plan (section 1101(2)(C)).

For these reasons, the reasoning of the bankruptcy court was flawed in this case as a matter of law. Accordingly, the Court will enter an order consistent with this opinion reversing the decision of the bankruptcy court.

---

4. The confirmed plan provided that the undersecured Class 6 claims were to be recovered by means of ten percent dividend payments over a period of ten years with the first payment due one year following confirmation.

5. Beginning payments date of Class 6 secured claims of May 16, 1986, plus 17½ years.