In re S & P, INC., Debtor.

S & P, INC., Plaintiff,

v.

Daniel H. PFEIFER and Sweeney, Pfeifer & Blackburn, Defendants.

Bankruptcy No. 87–31500.
Adv. No. 88–3051.

United States Bankruptcy Court,
N.D. Indiana,
South Bend Division.

Feb. 24, 1995.

Mark J. Phillipoff, Jones, Obenchain, Ford, Pankow & Lewis, South Bend, IN, for plaintiff.

John C. Hamilton, and Don G. Blackmond, Doran, Blackmond, Ready, Hamilton & Williams, South Bend, IN, for defendants.

## ORDER ON REMAND

ROBERT K. RODIBAUGH, Bankruptcy Judge.

This matter came before the court on a Complaint for Damages filed by S & P, Inc., on March 29, 1988, against one of its former attorneys and his law firm. The Complaint alleged legal malpractice by defendants, Daniel H. Pfeifer and Sweeney, Pfeifer & Blackburn. After trial held in May 1992, the court entered its judgment for plaintiff, S & P, Inc., on October 21, 1992, awarding damages in the amount of $11,000. Plaintiff appealed the judgment on the issue of damages to the United States District Court for the Northern District of Indiana, which affirmed the bankruptcy court by order dated July 28, 1993. Plaintiff appealed to the United States Court of Appeals for the Seventh Circuit. By order dated May 6, 1994, the Circuit Court reversed on the issue of damages, and remanded the case for a further determination. Both parties filed briefs on the issue. Hearing was held on December 5, 1994.

### Jurisdiction

This decision and order shall represent findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, made applicable in this proceeding by Federal Rule of Bankruptcy Procedure 7052. This is a non-core related proceeding within the meaning of 28 U.S.C. § 157(c). The parties have consented to this court's jurisdiction under 28 U.S.C. § 157(b)(1).

### Background

S & P, Inc. ("S & P") is an Indiana corporation doing business in Mishawaka, Indiana, as Big Bear Restaurant.[1] In 1986, S & P

---

1. The Big Bear Restaurant was located at the Town and Country Shopping Center, Mishawaka, Indiana. Unless otherwise indicated all further

opened another restaurant known as Chef Willies.[2] Chef Willies was unsuccessful from the outset and was closed within a year, having incurred significant obligations. The Big Bear Restaurant is thought to have remained profitable. However, its lease was soon to expire (January 11, 1988) and although the lease provided for an option to renew, S & P had not been able to negotiate a renewal. Also, S & P had been unsuccessful in efforts to sell the restaurant with a soon to expire lease. In addition, in the 1986–1987 period S & P lost its accountant because it was no longer able to pay her. With no accounting records that a buyer could audit, it is not surprising that no buyer was interested in purchasing the business.

In February or March 1987, S & P employed Daniel Pfeifer ("Pfeifer") and Sweeney, Pfeifer & Blackburn (the "Firm") to represent its interests in various legal matters concerning the corporate business. (Pfeifer and the Firm shall be referred to jointly as "Defendants.") Another of S & P's several problems was a dispute over the amount of monthly rent due under the terms of the lease agreement (the "Lease") that S & P had entered into on January 12, 1978, with Johnson Realty Company, Inc. ("Landlord"). The Lease was a ten-year lease of non-residential real property on which the Big Bear Restaurant was operated. William Schirf[3] contended that the Lease called for monthly rent payments of $2,200, although S & P had been paying $2,777.25 per month since the beginning of the Lease. This court found that the monthly rent payments should have been $2,425, and neither party appealed this finding. The Lease also provided that in addition to the yearly base rent of $29,100, S & P would pay a percentage rent "equal to Six (6%) per cent of the excess of annual gross sales and income, as hereinafter defined in excess of $300,000.00." [Exhibit 1 at 2.]

The Lease was to expire on January 11, 1988, but provided for three extensions of five years each. If renewed, the rent would increase in an amount equal to the increase in the Consumer Price Index from January 1, 1978, to the date of renewal. This court concluded, and the parties did not dispute, that the yearly rent would have increased to $54,038, or $4,503 per month, which represented a monthly increase of $2,078.

In addition to the rent dispute, three claims filed with the Equal Employment Opportunity Commission ("EEOC") as well as a demand by the Internal Revenue Service ("IRS") for approximately $50,000 owed by S & P for past due withholding and FICA taxes related to Chef Willies were pending, according to the testimony of William Schirf.

On August 24, 1987, none of the problems having been resolved, S & P filed its petition for relief under Chapter 11 of the Bankruptcy Code. William Schirf testified that it was S & P's intention that future profits generated by the Big Bear Restaurant would be used to satisfy pre-petition obligations, most of which Chef Willies incurred. Any plan proposed in accordance with this intention

references to "Big Bear" will concern only the restaurant in Mishawaka.

2. Chef Willies was located in Elkhart, Indiana.

3. On January 12, 1978 Johnson Realty Company, Inc., Vincent E. Schirf, President of S & P, and Norman A. Pride, Secretary and Treasurer of S & P entered into the lease. The Rent section of the Lease, especially paragraph A thereof [Exhibit 1, pg. 2], is most confusing, apparently not reflecting the actual terms of the Lease. It appears, early on, to have caused difficulty between the parties. At one of the meetings between the parties, they agreed on what the paragraph meant, but did not enter into written amendment of the Lease. However, Norman A. Pride's Affidavit of May 25, 1983, states "... that the tenant has, since the beginning of said Lease, paid a total sum of $2,777.25 each month, it being the intention of the parties that such sum would represent the following: $2,425 gross rental payment; $100 common area assessment, and the remaining accumulated balance to be applied to taxes payable by the tenant." [Exhibit 3, at B thereof.] Since S & P corporate records never became part of the evidence, we do not know how many restaurants the company may have operated in the decade before the Big Bear in Mishawaka closed. All we know is that when Vincent E. Schirf and Norman A. Pride (whom we assume were the sole stockholders of S & P) divided up the assets, Vincent got the Mishawaka restaurant and Norman received two other Big Bears. William Schirf (Vincent's son) apparently became manager of the Mishawaka Big Bear on June 1, 1980. He also appears to have become Treasurer of S & P.

would have been premised on the continuing operation of the Big Bear Restaurant.

This court found that Defendants failed to advise S & P that pursuant to 11 U.S.C. § 365 it had to assume the Lease within sixty days of filing its petition for relief.[4] As a result, on January 28, 1988, the Landlord obtained an order directing S & P to surrender immediately the property on which the Big Bear Restaurant was operating. Consequently, S & P surrendered the property five days later, forcing the Big Bear Restaurant to close. S & P subsequently sold all its assets and, by new counsel, filed a plan of liquidation.[5]

On March 29, 1988, S & P, having retained new counsel, filed its complaint seeking damages in excess of $200,000. The court found, and the parties agree, that the measure of damages is the value of the Big Bear Restaurant as an ongoing business. This court further found that from September 1, 1987, through January 31, 1988, while S & P was operating as debtor-in-possession and paying its bills as they became due, it accumulated $14,697.32 in cash. The Seventh Circuit found that the amount accumulated was actually $19,120.82.

This court also found that during the relevant five-month period S & P was paying the Landlord monthly building rent of $2,200. The Seventh Circuit found that during the five months S & P was actually paying between $5,047.40 and $5,113.72 in monthly building rent.

Using its figures of $14,697 accumulated cash and $2,200 monthly rent along with the expert testimony provided in the case, this court concluded that the Big Bear Restaurant would not have generated enough disposable income over a five-year period to fund any plan of reorganization that could have been confirmed under 11 U.S.C. § 1129. With a determination that reorganization was not possible, this court awarded damages in the amount of $11,000 representing lost inventory worth $2,000, a $5,000 retainer paid to Defendants, and $4,000 for new menus which were worthless once the business closed.[6] The Court of Appeals, having found the bankruptcy court's monthly rent and accumulated cash figures erroneous, remanded the case, stating:

> [W]e leave it to the bankruptcy court to determine on remand whether reorganization would have been possible and whether S & P's damages calculations are accurate, using the proper figures for the cash on hand on January 31, 1988, and the correct amount of rent paid.

[Order, May 6, 1994, at 5–6.]

### Discussion

■ Using the numbers determined by the Seventh Circuit, the court will reconsider whether it would have been possible for S & P to have filed any plan of reorganization that could have been confirmed under 11 U.S.C. § 1129. S & P argues that when the Court of Appeals determined the appropriate amount of cash that the debtor had accumulated from September 1, 1987, to January 31, 1988, and the average rent the debtor was paying during that period, it also adopted the five-year disposable income formula ("formula") this court had used in its October 21, 1992, opinion [Opinion, October 21, 1992, at 21–23], for determining whether S & P could have successfully reorganized. S & P alleges that when the Court of Appeals adopted the

---

**4.** Section 365 provides in relevant part:

Notwithstanding paragraphs (1) and (2), in a case under any chapter of this title, if the trustee does not assume or reject an unexpired lease of non-residential real property under which the debtor is lessee within 60 days after the date of the order for relief, or within such additional time as the court, for cause, within such 60-day period fixes, then such lease is deemed rejected, and the trustee shall immediately surrender such nonresidential real property to the lessor.

11 U.S.C.S. § 365(d)(4) (Callaghan 1995).

**5.** S & P filed its Amended Plan of Reorganization for liquidation on April 25, 1989. A Second Amended Disclosure Statement was filed on June 26, 1989, and the plan was confirmed by order dated February 20, 1990.

**6.** The court awarded damages in the principal amount of $11,000, with pre-judgment interest thereon in the amount of $3,391, and interest from the date of judgment at the rate of 3.24% per annum. The parties do not dispute the award or amount of either pre-judgment or post-judgment interest.

formula devised by this court, it became the law of the case and is therefore not subject to further review. According to S & P, the Court of Appeals did not intend for the bankruptcy court to reevaluate all of the evidence presented at trial in an effort to determine whether or not reorganization were possible. S & P argues that applying the new cash accumulation and rent figures to the formula first introduced by John W. Thomas ("Thomas") at trial, and then later used by this court in its October 21, 1992, decision, would result in a finding that reorganization would be possible.

S & P asserts that instead of using $14,697.32 as the figure for the amount of cash the Big Bear Restaurant accumulated between September 1, 1987, and January 31, 1988, this court should use the figure of $19,120.82, supplied by the Court of Appeals. Additionally, instead of finding that S & P was paying only $2,200 for rent, this court should find that S & P was paying rent in the amount of $5,047.40 or $5,113.72, as provided by the Court of Appeals. According to S & P, if this court uses the formula adopted in its October 21, 1992, decision, it should find that the Big Bear Restaurant would have generated more than enough money to fund a successful Chapter 11 plan of reorganization. Applying the formula suggested by S & P, this court would first determine the average monthly income, account for the additional rent the Big Bear Restaurant would have been required to pay when it renewed the Lease with the Landlord on January 12, 1988, then take this number and multiply it by twelve months to obtain the average net annual income for the Big Bear Restaurant. Finally, to determine the restaurant's net income over the five-year period the court would multiply the annual net income by five.[7]

Thomas, the certified public accountant who testified on behalf of S & P, suggested the use of the monthly reports filed by S & P while it was in bankruptcy, as a basis for determining the value of the Big Bear Restaurant as an ongoing concern. Thomas concluded that the proper valuation of the restaurant would be based on the flow of income the restaurant was generating while operating in bankruptcy. In determining the cash flow of the Big Bear Restaurant, Thomas chose to analyze the restaurant's last five months of operation. [Exhibit 34.] Thomas testified that the reason he focused only on the five months the restaurant was in bankruptcy was because extenuating circumstances that occurred prior to the bankruptcy

7. The following is S & P's report of the amount of income they would have generated over the course of a five-year period:

| | | Findings |
|---|---|---|
| (1) | Average Net Monthly Income 9/1/87–1/31/88 ($19,120.82/5) | $ 3,824 |
| (2) | Additional Average Monthly Rent After Assumption of Lease ($2,425 (base rent) + $2078 (additional rent) + 1,542.36 (percentage rent)—$5,047 (rent S & P had been paying) | $ 998.36 |
| (3) | Average Net Monthly Income After Assumption of Lease (# 1 minus # 2) | $ 2,825 |
| (4) | Average Net Annual Income (Average Net Income/Loss After Assumption Of Lease × 12) (# 3 × 12) | $ 33,909.60 |
| (5) | Net Income/Loss Over 5 Year Period After Assumption Of Lease (# 4 × 5 years) | $169,548 |

[Plaintiff–Appellant's Proposed Post–Appeal Findings and Conclusions, at 4–5.]

would have resulted in an improper valuation of the restaurant as an ongoing concern. The circumstances included the failure of the Chef Willies' venture, the exodus of a prior owner, along with employment tax problems. Additionally, Thomas testified that he did not account for the restaurant's debts in his calculations, because those debts would not have impacted the cash flow that the business was generating in bankruptcy. Thomas testified that another reason he chose to rely only on S & P's September 1, 1987, to January 31, 1988, business reports [Exhibits 12–16] was because these monthly operational reports had to be verified through bank statements which S & P was required to include with its monthly filings.[8] Based on his prior experience, Thomas assessed that information submitted to a federal court would have more integrity than other financial statements which were used to determine the financial picture of the Big Bear Restaurant.

Thomas concluded after reviewing the Big Bear Restaurant's cash flow for the five months it operated in bankruptcy, that an investor would be willing to purchase the business for $216,835. [Exhibit 34.] He reached this conclusion by first calculating the annual adjusted net cash flow after taxes. This amount was $43,367.16. [Id.] Thomas then determined that an investor seeking a 20% return on investment would have purchased the business for $216,835. [Id.]

The Defendants counter by suggesting that the Court of Appeals did not intend to "straight jacket" this court. Had the Court of Appeals intended that this court simply plug in the new figures for cash accumulation and rental payments as S & P suggests, the appellate court would have performed this *de minimis* task itself, instead of remanding this case for further consideration. The Defendants contend that by remanding this case to the bankruptcy court for further consideration the Court of Appeals intended to give this court the opportunity to evaluate further the evidence presented at trial in an effort to determine whether or not reorganization were in fact possible. In order to determine this issue, the Defendants suggest that this court give further consideration to the testimony of William L. Wilson ("Wilson"), a certified public accountant, Timothy J. Mehall ("Mehall"), a commercial real estate salesman, and Joseph Bradley ("Bradley"), a Chapter 7 interim trustee and practicing bankruptcy attorney, as well as a comparative statement of the Big Bear Restaurant operations [Exhibit B][9] prepared by Thomas.

Initially, Wilson discussed the negative aspects of the Lease. He determined that S & P's monthly adjusted net income was $1,553. According to Wilson, had S & P renewed the lease on January 12, 1988, its rent would have increased by 85.76%, representing the increase in the Consumer Price Index from January 1, 1978, to January 1, 1988. [Exhibit C at 2.] Based upon S & P's net monthly income and the increase in rental payments, Wilson concluded that the increase in rental payments would exceed S & P's adjusted net income. Therefore, Wilson determined that the Lease had no value.

Wilson further testified after examining the economic history of the Big Bear Restaurant as it appeared in the comparative statements of the company's operations, he observed that the restaurant's cash flow was modest at best. He observed that at no time was there a clear indication that the restaurant was making substantial profits. In fact,

---

8. All five monthly operational reports were filed on April 27, 1988, long after the dates they were due. William Schirf testified that he had originally provided Pfeifer with these forms to prepare and then file with the bankruptcy court. According to William Schirf, however, Pfeifer failed to perform this task.

9. This exhibit provides a financial picture of the Big Bear Restaurant for the years of 1983 through 1987, with the additional inclusion of the first month of 1988. However, the year of 1986 only includes an analysis of the time period from January 1, 1986 to August 31, 1986, and the year of 1987 only includes an analysis of the time period from September 1, 198, to December 31, 1987. Additionally, the monthly average for the items listed under the September 1, 1987, through December 31, 1987, dates appears to be incorrect. The individual performing the computations for the comparative statement of operations appears to have divided the sales figure of $205,355 by three, instead of correctly dividing that number by four. [Exhibit B.]

the restaurant's financial picture substantially worsened in 1986 when it suffered a loss in the amount of $40,418. [Exhibit B.] Wilson also testified that reading the data provided in the comparative statements of operations alone would not be sufficient to gather an overall impression of the potential profitability of the Big Bear Restaurant. While the comparative statements of operations provided a good indication of the profit picture for the restaurant's earlier years, the information beginning in 1986 was less reliable. According to Wilson, the August 1, 1987, to December 31, 1987, time frame represented a time period which was clearly seasonal; whereas, prior years gave an annual overview of the restaurant, accounting for both high periods and low periods of business. Additionally, the comparative statements of operations do not provide sufficient data as to the value of the inventory, the supplies, or the fixtures.

Wilson disagreed with S & P's contention that the best method for determining the value of the Big Bear Restaurant was to use the cash flow the company generated while in bankruptcy. According to Wilson, a company in bankruptcy is operating in a completely different fashion from normal operations. A company operating under Chapter 11 is presented with certain cash flow restrictions, requiring it to watch what it orders as well as how it pays for what it orders. Further, after reviewing S & P's Exhibit 34 at trial, Wilson concluded that the numbers listed in the exhibit did not represent an accurate forecast of how the business was going to operate in the future. According to Wilson, Exhibit 34 represented a mere compilation of numbers, rather than a serious attempt at projecting the cost of operating the Big Bear Restaurant. Finally, Wilson concluded that no investor would pay anything close to $200,000 for the Big Bear Restaurant. He testified that no potential investor would be willing to purchase a restaurant that was projected to generate $600,000 in sales in a

year, with an estimated profit of $42,000, because these calculations would only allow payment of $13,000 for management salaries which would be too small for any interested buyer.

Realtor Mehall also examined the Lease and concluded that it had no value. Mehall calculated that the rental payments would have increased by 65.7% had the Lease been renewed.[10] Mehall determined that upon renewal of the Lease, S & P would have been required to make rental payments of $13.98 per square foot, while comparable property in the same area rented for $7.00 to $11.00 per square foot. [Exhibit D, at 2.] Mehall further testified that there was nothing extraordinary about the building which would indicate why its monthly rent payments should have been higher than other buildings in the area. In fact, Mehall observed that the building was aged somewhat, and that the parking lot was in need of repair work.

Finally, as support for their position that the Big Bear Restaurant would not have been able to reorganize successfully, the Defendants offered the testimony of Bradley. Bradley testified that on average only about 10% to 12% of the Chapter 11 cases filed successfully reorganize.[11] Additionally, Bradley identified a number of factors which may prevent a Chapter 11 reorganization from succeeding. Bradley stated that typically a company in a Chapter 11 (1) will experience an increase in the cost of operations, (2) will lose some of its original vendors, (3) will have vendors who are providing discounts for orders discontinue the discounts, (4) will be required to obtain new vendors at a higher price after original vendors terminate sales to the debtor altogether, (5) will be required to pay the same for insurance costs, if not more, (6) will suffer a loss in income, and finally, (7) will suffer a loss in personnel. Bradley testified that a factor which was important in this case was the lack of assets which could be readily

10. In its earlier opinion, the court considered Mehall's assessment of the increase in the Consumer Price Index, but chose to adopt Wilson's figure of 85.7%, because Wilson had arrived at his figure after actually researching the issue.

11. Bradley testified that this figure came from a statistical analysis issued by the Administrative Office of the United States Courts. Actually, the analysis had been conducted by Ernst and Young and involved approximately 2,400 Chapter 11 cases filed prior to 1987.

accessible to sell in an effort to aid in S & P's reorganization. This was a real limiting factor for S & P because it had no significant corporate assets. Finally, after examining S & P's schedules, Bradley concluded that S & P had approximately a one-in-ten chance of reorganizing successfully.

Based upon the observations of its witnesses, the Defendants suggested that the only way to determine whether reorganization were possible is to examine the entire financial history of the Big Bear Restaurant. According to the Defendants, in order to obtain this necessary insight the court must carefully consider the financial condition of the restaurant for all the years listed in the comparative statement of operations, with the exception of 1988, because that year only provided the figures for one month of operations. Under the formula suggested by the Defendants, the court would first add the profits generated from January 1, 1986, to August 31, 1986, with the profits generated from September 1, 1987, to December 31, 1988. The court would then add that number to the profit margin numbers for the years 1983 through 1985 and divide by four to obtain the overall profit margin average. According to calculations performed by the Defendants, that number would be $10,616. The court would next be required to determine the average monthly profit, which according to calculations performed by the Defendants, is $885 per month. Finally, to determine whether or not S & P could have successfully reorganized based on the rent increase which S & P would have incurred when it renewed the Lease with the Landlord on January 12, 1988, the court would be required to factor in an additional rent payment of $2,080 [12] per month. According to the Defendants' calculations, upon renewal of the Lease the Big Bear Restaurant would have suffered a yearly loss of $14,340 per year or $1,195 per month.

As for S & P's contention that the formula applied by this court in its earlier decision became the law of the case thus prohibiting the court from considering additional infor-

mation presented at trial concerning whether reorganization were possible, the court concludes that S & P has misconstrued the law of the case doctrine. In *Exxon Corp. v. U.S.*, 931 F.2d 874, 877 (Fed.Cir.1991) (quoting *Jamesbury Corp. v. Litton Indus. Prod., Inc.*, 839 F.2d 1544 (Fed.Cir.1988), *cert. denied*, 488 U.S. 828, 109 S.Ct. 80, 102 L.Ed.2d 57 (1988)), the court summarized the doctrine as follows:

"The law of the case is a judicially created doctrine, the purposes of which are to prevent the relitigation of issues that have been decided and to ensure that trial courts follow the decisions of appellate courts. The doctrine requires a court to follow the decision on a question made previously during the case.... When a judgment of a trial court has been appealed, the decision of the appellate court determines the law of the case, and the trial court cannot depart from it on remand.... Orderly and efficient case administration suggests that questions once decided not be subject to continued argument, but the court has the power to reconsider its decisions until a judgment is entered."

 When a case is remanded the trial court is bound to obey strictly the appellate mandate. *In re Sanford Fork & Tool Co.*, 160 U.S. 247, 255, 16 S.Ct. 291, 293, 40 L.Ed. 414 (1895); *Bethea v. Levi Strauss and Co.*, 916 F.2d 453, 456 (8th Cir.1990). If the appellate court has remanded a case to the trial court for further proceedings consistent with the appellate court's decision, all issues decided by the appellate court become the law of the case. *Bethea*, 916 F.2d at 456. It is incumbent upon the trial court to uphold both the "letter" and "spirit" of the mandate, giving appropriate recognition to the appellate court's opinion and the circumstances it embraces. *Bankers Trust Co. v. Bethlehem Steel Corp.*, 761 F.2d 943, 949 (3rd Cir.1985). *See also Colville Confederated Tribes v. Walton*, 752 F.2d 397, 400 (9th Cir.1985); *Wheeler v. City of Pleasant Grove*, 746 F.2d 1437, 1440 n. 2 (11th Cir.1984). However, while the trial court must closely observe the rul-

---

**12.** This was the number the Defendants suggested that the court use in its calculation. However, as the court indicated both in its October 21, 1992 opinion [Opinion, October 21, 1992, at 21, n. 3] and earlier in this opinion the increase in rent would amount roughly to $2,078.

ings of the appellate court, the trial court is not bound by issues which have not actually been considered by the appellate court. *Holcomb v. United States,* 622 F.2d 937, 940 (7th Cir.1980). Thus, it has long been the recognized view that a trial court is not bound by its prior rulings if they have not been adopted by the appellate court's judgment either explicitly or implicitly. *See Quern v. Jordan,* 440 U.S. 332, 347 n. 18, 99 S.Ct. 1139, 1148 n. 18, 59 L.Ed.2d 358 (1979).

In remanding this case to the bankruptcy court, the Seventh Circuit stated:

> [W]e leave it to the bankruptcy court to determine on remand whether reorganization would have been possible and whether S & P's damages calculations are accurate, using the proper figures for the cash on hand on January 31, 1988, and the correct amount of rent paid.

While the Court of Appeals did state in its opinion that this court had applied the wrong numbers in its earlier decision, the appellate court did not require this court simply to plug these new numbers into the formula used by the court in its October 21, 1991, opinion to determine whether reorganization was possible. The earlier decision of this court that reorganization was not possible did not rest solely on evaluating the financial condition of the Big Bear Restaurant while it was in operation from September 1, 1987, to January 31, 1988. In fact, when finding that S & P could not have successfully reorganized, this court gave careful consideration to the testimony of Wilson and Mehall. It was because this court had a concern for the accuracy of much of the financial data presented at trial relating to the operation of the Big Bear Restaurant, that it choose to consider the testimony of Wilson and Mehall as well as the monthly operating reports in determining whether reorganization would be possible.[13]

The problem from the beginning which made it so difficult for S & P ever to succeed in proving that it could have submitted a feasible plan of reorganization was its lack of books and records. When no real plan of reorganization supported by a disclosure statement with projections pointing to a successful reorganization is ever filed, it is difficult for a bankruptcy court to conjure up a scenario that would satisfy 11 U.S.C. § 1129. Even though S & P's records may have been poorly kept over the last few months prior to this Chapter 11, copies of income tax returns and financial statements for the last two or three years along with testimony of an accountant who had either prepared or performed a real audit would have been helpful in determining whether reorganization would have been possible.

◼ In remanding this issue, the Court of Appeals has given this court the opportunity once again to scrutinize closely the evidence presented at trial to determine if in fact S & P could have possibly reorganized. While it is true that applying the new cash accumulation and rent figures provided by the Court of Appeals to the formula this court used in its October 21, 1992, decision may have resulted in a finding that S & P would have generated income in the amount of $169,548, this court still concludes that reorganization would not have been possible. In determining whether reorganization were possible, a court is required to consider the feasibility of any plan proposed for confirmation. 11 U.S.C.S. § 1129(a)(11) (Callaghan 1995). According to this provision, it must appear that confirmation of the plan will not likely be followed by liquidation, or the need for further financial reorganization by the debtor. 11 U.S.C.S. § 1129(a)(11) (Callaghan 1995). In determining whether the proposed plan meets the requirement of § 1129(a)(11), courts have considered the following factors:

> (1) the adequacy of the capital structure; (2) the earning power of the business; (3) economic conditions; (4) the ability of man-

---

**13.** According to the testimony of William Schirf, Helen Mason ("Mason"), S & P's accountant, had been doing the company's books since 1983. William Schirf testified that he supplied Mason with disbursement ledgers, sales ledgers, and other company financial records so she could calculate the company's taxes as well as create financial statements detailing the company's financial picture. According to William Schirf, when S & P could not pay Mason she failed to turnover the tax returns she had prepared for the year 1986, as well as the financial statement she had prepared for the first six months of 1987.

agement; (5) the probability of the continuation of the same management, and; (6) any other related matters which determine the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.

*In re Elsinore Shore Assocs.*, 91 B.R. 238, 275 (Bankr.D.N.J.1988) (citing *In re Landmark at Plaza Park, Ltd.*, 7 B.R. 653, 659 (Bankr.D.N.J.1980)). *See also In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 151 (Bankr.S.D.N.Y.1984). Additionally, courts have considered the availability of prospective credit, the adequacy of funds for equipment replacement, and provisions for adequate working capital. *See e.g., In re Jartran, Inc.*, 44 B.R. 331, 393 (Bankr.N.D.Ill. 1984).

Pursuant to 11 U.S.C. § 1129(a)(11) it would have been impossible for S & P to have submitted a feasible plan of reorganization. The Big Bear Restaurant clearly did not have a sound financial base. At the time S & P filed for bankruptcy, the Big Bear Restaurant's liabilities far exceeded its assets. According to Bradley, S & P's lack of significant assets posed a major problem, because if S & P were going to reorganize successfully, it needed readily accessible assets which it could sell in an effort to aid in reorganization. Additionally, because of the high volume of company creditors and the fluctuating profitability of the restaurant, S & P would not have been able to receive financing for new equipment if needed, either from a new creditor or an old creditor. Since all of S & P's profits from the Big Bear Restaurant would have been needed to pay off company creditors, the restaurant would have been unable to purchase new equipment if needed to keep the Big Bear Restaurant in operation. Therefore, any significant problems with equipment could have caused the restaurant to close, forcing S & P from a reorganization plan into a liquidating plan. Clearly, the lack of capital as well as the fluctuating profit margin shown by the Big Bear Restaurant during its history would have made reorganization impossible. Thus, the court is unable to imagine any plan of reorganization that it might have confirmed.

Furthermore, after careful review of the views expressed by Thomas and Wilson, the court is skeptical as to whether or not the formula suggested by Thomas in fact represents the most accurate future financial picture for the Big Bear Restaurant. As noted previously, Thomas, the certified public accountant who testified on behalf of S & P, stated that the best way of determining whether or not S & P could have successfully reorganized was by considering the Big Bear Restaurant's cash flow for the time period in which S & P was operating the Big Bear Restaurant as a debtor-in-possession. Thomas testified that this period was the best time to value the restaurant's profitability because of prior extenuating circumstances which hurt the company financially. Conversely, Wilson, the certified public accountant who testified on behalf of the Defendants, stated that an examination of the operations of the Big Bear Restaurant for the period of time while S & P was in bankruptcy would not accurately reflect the profits the company would generate in a five-year period. He indicated that the monthly reports filed by S & P while it was in bankruptcy did not accurately reflect the Big Bear Restaurant's annual profit margin, because this five-month period was only seasonal. The monthly reports also did not represent the high and low periods that a business normally experiences in a year of operations. Therefore, Wilson suggested that in order to obtain a more accurate representation of the Big Bear Restaurant's yearly profit margin, it would be necessary to consider years which gave an annual overview of the restaurant, accounting for both high periods and low periods of the business.

The court concludes that in order to conduct the most accurate investigation into whether S & P could have successfully reorganized, most weight must be given to figures which represent an annual overview of the operations of the Big Bear Restaurant. If the court were to examine only the figures provided in the monthly operating reports filed for the time period from September 1, 1987, through January 31, 1988, it would be considering only seasonal operations for the Big Bear Restaurant. Therefore, in an effort to determine accurately the Big Bear

Restaurant's average yearly profit margin, the court would need to examine primarily the years of 1983 through 1985 as provided in Exhibit B. The court would give little weight to the figures from the years 1986 through 1988 because these statistics provided in part in Exhibit B and Exhibits 12–16 do not represent complete years of operations for the Big Bear Restaurant. While it is evident to the court that the 1983 through 1985 statements of operations provided in Exhibit B likely include payments on debts for which S & P would not be responsible while operating as a debtor in possession, the court could effectively account for many of these debts by using the adjusted schedule of operation figures provided in the comparative statements of operations. [Exhibit B.] In addition, Big Bear Restaurant incurred many debts during earlier operations which S & P would have had to incur again if its plan of reorganization were to succeed. Some of these expenses included: linen service; advertising; beverage service; food service; waste removal; and telephone service. [Exhibit 5.]

In calculating S & P's disposable income for a five-year-period, the court could proceed as follows: first average the total sales for the years 1983 through 1985, as provided in Exhibit B, obtaining a figure of $518,-311.67; then, average the figures provided in the adjusted schedule of operations determining that S & P's average profit would be $25,287.33 or $2,107.28 a month; next, average the amount of monthly rent paid by S & P during the years 1983 through 1985 concluding that S & P would be paying a monthly rent of $3,963.33;[14] then, factor in the additional rent S & P would have been required to pay when it renewed the Lease on January 12, 1988 ($2,425 + $2,078); subtract this amount from $3,963.33 determining that S & P would be required to pay an additional $539.67 in rent each month; then, after subtracting the additional monthly rental payments from the monthly profits, the court would determine that S & P would have had disposable income of $1,567.61 a month or $18,811.32 per year. Finally, in order to determine S & P's disposable income for a five-year-period the court would multiply $18,811.32 by five generating a figure of $94,-056.60 in disposable income.

The final step for this court would have been to determine whether based on the $94,056.60 in projected disposable income, S & P could have formulated a successful plan of reorganization. As previously indicated, the court would have been able to confirm a plan of reorganization proposed by S & P only if all of the § 1129 requirements had been met.

In accordance with § 1129(a)(7)(A)(ii), a plan must provide that creditors with impaired claims or interests will receive or retain, as of the effective date of the plan, an amount "that such holder would receive or retain if the debtor were liquidated under chapter 7 of this title on such date." 11 U.S.C.S. § 1129(a)(7)(A)(ii) (Callaghan 1995). Additionally, § 1129(b)(2)(A)(i)(II) provides that with respect to secured claims, the holders of claims in this class must receive cash payments "totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property." 11 U.S.C.S. § 1129(b)(2)(A)(i)(II) (Callaghan 1995). These two provisions require that the court calculate the present value of the plan's stream of payments. The "concept of present value assumes the use of *market* rates of interest (as distinguished from the rate specified in the contract) for loans of similar duration, with similar security, and with similar rates." *In re Gene Dunavant & Son Dairy,* 75 B.R. 328, 335 (M.D.Tenn.1987) (emphasis in original) (citing 5 *Collier on Bankruptcy* (MB) ¶ 1129.03[i] (15th ed. 1985) and *Memphis Bank & Trust Co. v. Whitman,* 692 F.2d 427 (6th Cir.1982)). *See also U.S. v. Arnold,* 878 F.2d 925 (6th Cir.1989); *In re Apple Tree Partners, L.P.,* 131 B.R. 380, 398 (Bankr. W.D.Tenn.1991).

---

**14.** Because the base rent figure would have been $2,425 from 1983 through 1985, the court assumes that the monthly rent the Big Bear Restaurant was paying included the additional 6% rent the Big Bear Restaurant was required to pay when its annual gross sales and income exceeded $300,000.

Under ordinary circumstances, the accumulation of interest on a creditor's claim against the debtor stops when the bankruptcy petition is filed. *In re Boston and Maine Corp.*, 719 F.2d 493, 495 (1st Cir.1983); *In re Petite Auberge Village*, 650 F.2d 192, 194 (9th Cir.1981). However, an exception to this general rule is present in § 506(b), whereby an oversecured creditor will continue to accumulate interest post-petition as long as the principal and interest do not exceed the value of the collateral. *In re Ladycliff College*, 56 B.R. 765, 767 (S.D.N.Y. 1985). Once the collateral is depleted, the creditor no longer has any further property interest and therefore the payment of interest abates. *Id.* As for the rate of interest an oversecured creditor will receive on its claim, the bankruptcy court will apply the security agreement's rate of interest. *In re Snider Farms, Inc.*, 83 B.R. 977, 988 (Bankr. N.D.Ind.1988) (Lindquist, J.); *In re Johnston*, 44 B.R. 667, 669 (Bankr.W.D.Mo.1984).

Although the contract rate of interest is allowed for a fully secured creditor up to the effective date of the plan under § 506(b), this rule has no application to the present value analysis required by § 1129, or to the interest payable on claims after the effective date of the plan. 3 *Collier on Bankruptcy* (MB) ¶ 506.05, at 506–43 (15th ed. 1994); *Snider Farms*, 83 B.R. at 989; *Gene Dunavant & Son Dairy*, 75 B.R. at 336. In considering the appropriate interest rate to be paid by a debtor to insure that a secured creditor receives the present value of its allowed secured claim as of the effective date of confirmation, Judge Lindquist noted that while the Seventh Circuit has not directly ruled on the issue as it relates to secured creditors, in *In re Burgess Wholesale Mfg. Opticians, Inc.*, 721 F.2d 1146 (7th Cir.1983), the Court of Appeals considered the legal meaning of the phrase "value as of the effective date of the plan," as it related to § 1129(a)(9)(C). *Snider Farms*, 83 B.R. at 989. The same phrase is contained in § 1129(b)(2)(A)(i)(II), which relates to secured creditors. In *Burgess*, the Court of Appeals held:

"A court may confirm a reorganization plan, over an objection, only if with respect to an unsecured priority tax claim, 'the holder of such claim will receive on account of such claim deferred cash payments … of a value, as of the effective date of the plan, equal to the allowed amount of such claim.' 11 U.S.C. § 1129(a)(9)(C).

\* \* \* \* \* \*

Thus in our view, the critical phrase 'value, as of the effective date of the plan' means that proposed payments must be adjusted to allow for the changing value of a dollar. The proposed payments, once adjusted, must equal the face value of the claim at the time the plan is confirmed. …

The legislative history of § 1129(a)(9)(C) conclusively supports our interpretation. The House Judiciary Committee's report accompanying the legislation states that the phrase 'value as of the effective date of the plan' as used in § 1129(a)(9)(C) 'indicates that the promised payment under the plan must be discounted to present value as of the effective date of the plan.' H.R.Rep. No. 595, 95th Cong., 2d Sess. 408 U.S.Cong.Code & Admin.News 1978, 5787 (1978). The report continues its explication of the statute.

This contemplates a present value analysis that will discount value to be received in the future; of course, if the interest paid is equivalent to the discount rate used, the present value and face future value will be identical. On the other hand, if no interest is proposed to be paid, the present value will be less than the face future value. *Id.* at 414–415; *accord* 124 Cong.Rec. 32,406, 34,006 (1978) (joint explanatory statement of floor managers)."

*Snider Farms*, 83 B.R. at 989 (quoting *Burgess*, 721 F.2d at 1147).

After concluding that the phrase "value, as of the effective date of the plan" referred to in § 1129(b)(2)(A)(i)(II) should be treated consistently with the meaning given to this phrase by the Court of Appeals when it interpreted the wording in § 1129(a)(9)(C), Judge Lindquist determined that when calculating the appropriate discount rate a court must look to current market rates for similar loans, taking into consideration the length of the loan, the quality of the security, and the risk of subsequent default. *Snider Farms*,

83 B.R. at 992. Furthermore, this determination must be made on a case by case basis. *Id. See also 5 Collier on Bankruptcy* (MB) ¶ 1129.03, at 1129–65 (15th ed. 1982); *In re Loveridge Mach. & Tool Co.*, 36 B.R. 159 (Bankr.D.Utah 1983).

■ A court must also consider § 1129(a)(9)(C). This section provides that a debtor may choose to defer payment on prepetition tax claims, for "a period not exceeding six years after the date of assessment of such claim, of a value, as of the effective date of the plan, equal to the allowed amount of such claim." 11 U.S.C.S. § 1129(a)(9)(C) (Callaghan 1995). This provision has generally been interpreted as giving debtors an alternative treatment for priority tax claims. A debtor may either choose to pay the priority taxes in full on the effective date of the plan, or defer payment of the priority tax claims over a period of up to six years from the date of assessment. However, the majority of bankruptcy courts has determined that when a debtor chooses to defer payment under § 1129(a)(9)(C), the only proper method for providing the creditor with an amount equal to the value of its claim as of the effective date of confirmation of the plan is to charge interest on the claim throughout the payment period. *See Terex Corp. v. Metropolitan Life Ins. Co.*, 984 F.2d 170, 174 (6th Cir.1993); *In re Southern States Motor Inns, Inc.*, 709 F.2d 647, 650 (11th Cir.1983); *U.S. v. White Farm Equip. Co.*, 157 B.R. 117, 120 (N.D.Ill.1993); *U.S. v. Arrow Air, Inc. (In re Arrow Air, Inc.)*, 101 B.R. 332, 335–36 (S.D.Fla.1989); *Snider Farms*, 83 B.R. at 989–996. Additionally, § 1129(a)(9)(A) re-

quires that a plan of reorganization contain a provision for payment in full of all allowed expenses of administration. 11 U.S.C.S. § 1129(a)(9)(A) (Callaghan 1995).

According to Schedule A–2 and Schedule A–3, at the time S & P filed its voluntary petition for relief under Chapter 11, the company had secured debts totaling $18,298.55[15] and unsecured debts totaling $122,870.28.[16] Further, S & P had priority claims in the amount of $50,412.83, comprising claims of $48,412.83[17] for taxes due between December 1986 and May 1987, and an EEOC claim in the amount of $2,000.

Thus, at the time S & P would have proposed a Chapter 11 plan of reorganization, it would have owed secured claims and priority claims totaling $68,711.38 or $71,893.38 (depending on whether or not the IRS proof of claim in the amount of $51,594.36 were accepted). This figure does not include any priority claims that S & P would have had to pay over the life of the plan. S & P most likely would have incurred administrative fees for attorney and accountant work, as well as services performed by other professionals. The court simply cannot speculate as to the amount of additional administrative expenses that S & P would have incurred over the life of its plan, but concludes that these fees would have significantly increased the amount in priority claims held against S & P.

Based on the court's earlier calculations, at best S & P would have been earning $18,811.32 a year operating under a plan of reorganization. Because S & P would not have had sufficient funds to pay both the secured

---

15. According to S & P's Schedule A–2, the secured debt consisted of obligations to St. Joseph County Bank & Trust Company in the amount of $1,500, Metlife Credit Corporation in the amount of $1,000, and Midwest Commerce Leasing in the amount of $6,121. [Exhibit 5.] Additionally, First National Bank of Elkhart had a secured debt in the amount of $14,284. However, according to S & P's Amended Plan of Reorganization for liquidation filed on April 25, 1989, at the time S & P first filed for bankruptcy the collateral was worth approximately $9,600. Thus, First National Bank of Elkhart, in fact, only had a secured claim totaling $9,600.

16. This figure also includes a claim for $1,500 which was filed after S & P filed its schedules.

On November 30, 1987, a complaint was filed on behalf of Ms. Lutz in the United States District Court for the Northern District of Indiana, *Equal Employment Opportunity Commission v. S & P, Inc. d/b/a Big Bear Restaurant*, Civil Action No. S87–00580. On July 19, 1988, a Motion for Authority to Settle Lawsuit was filed, which stated that Ms. Lutz was to receive a priority wage claim for $2,000 and an unsecured claim for $1,500.

17. The IRS filed a proof of claim in the amount of $51,594.36. If this figure does in fact more accurately reflect the amount due, the priority debt would increase by $3,182, for a total of $53,594.36.

claims and the priority tax claims at the time of confirmation, those claims would have had to have been deferred and paid over a five-year period. Therefore, pursuant to § 1129(a)(7)(A)(ii), § 1129(b)(2)(A)(i)(II), and § 1129(a)(9)(C), S & P would have had to pay interest on these claims so that the claim holders would receive the value of their claims as of the effective date of the plan. Furthermore, pursuant to § 1129(a)(9)(A), S & P would have been required to pay all of its administrative expenses in full. Under § 1129(a)(9)(A), "if the secured parties desire confirmation, the administrative claims must be paid in full in cash at confirmation even if it means invading the collateral." *In re Emons Indus., Inc.,* 76 B.R. 59, 60 (Bankr. S.D.N.Y.1987). Thus, according to the court's suggested calculations, any plan proposed by S & P would have been required to provide for the payment of the $2,000 EEOC claim, as well as any fees for attorneys, accountants, or other professionals hired by S & P.

Based on the court's calculations, it would determine that the added amount of interest that S & P would have been required to pay for deferring payment on the secured claims and the tax priority claims as well as the future administrative costs that S & P would have been required to bear alone would have made reorganization impossible.

In as much as reorganization would have been impossible under both of the scenarios discussed above, the court determines that damages awarded to S & P in its October 21, 1992 order of $11,000 with pre-judgment interest in the amount of $3,391 is proper and correct. It is

SO ORDERED.

### *JUDGMENT ON REMAND*

Using figures found on appeal to be proper for cash on hand on January 31, 1988 and the correct amount of rent paid, the court determines on remand that reorganization of S & P would not have been possible. Further, the court determines that damages awarded to S & P in its October 21, 1992 order of

$11,000 with pre-judgment interest in the amount of $3,391 is proper and correct. It is

SO ADJUDGED.